UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EHO360, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-0724-B |
| | § | |
| NICHOLAS OPALICH and TAMMY | § | |
| RADCLIFF, | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Nicholas Opalich ("Opalich"), Tammy Radcliff ("Radcliff"),

Crevice Capital Partners, LLC ("Crevice"), HealthView Capital Partners, LLC ("HealthView"), and

HospisRX, LLC ("HospisRX")'s Motion to Dismiss (Doc. 15). In the motion, all Defendants move

to dismiss Plaintiff EHO360, LLC ("Plaintiff")'s claims for failure to state a claim; additionally,

Crevice, HealthView, and HospisRX move to dismiss the claim against them for lack of personal

jurisdiction.[1] At a hearing held on July 16, 2021, the Court granted the motion to the extent the

Entity Defendants sought dismissal for lack of personal jurisdiction.

This Order rules on the portion of Defendants' motion seeking dismissal of Plaintiff's

remaining claims for failure to state a claim upon which relief may be granted. For the reasons

explained below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to

---

[1] The Court refers to Crevice, HealthView, and HospisRX collectively as "the Entity Defendants" for purposes of brevity. Nevertheless, because the Court held that it lacks personal jurisdiction over Crevice, HealthView, and HospisRX, they are not currently defendants in this lawsuit.

dismiss for failure to state a claim.

## I.

## BACKGROUND

*A.    Factual Background*[2]

This dispute arises from two high-level executives' alleged involvement in a business venture competing with their former employer. Plaintiff, a Texas limited-liability company (LLC), is a "prescription claims processor and pharmacy benefit manager focusing on administering prescription claims for," among other clients, "hospice programs, health maintenance organizations, third party administrators, preferred provider organizations, [and] other pharmacy benefit management companies[.]" Doc. 5, Am. Compl., ¶¶ 2, 13.[3]   Plaintiff's services include "designing and implementing pharmacy plans and performing ongoing administration of pharmacy plans." *Id.* ¶ 13.

### 1.    The Opalich Agreement

On February 1, 2019, Plaintiff hired Opalich as Chief Executive Officer (CEO) pursuant to an employment agreement ("the Opalich Agreement"). *Id.* ¶ 15. The Opalich Agreement contains covenants that "Opalich expressly agreed 'are reasonable and properly required for the adequate protection of [Plaintiff] and its affiliates.'" *Id.* ¶ 17.

Specifically, Opalich agreed that during his employment with Plaintiff, he would "'devote his full-time attention and energies to the performance of his duties as an executive of [Plaintiff]' and

---

[2] The Court draws the factual background from the allegations in Plaintiff's operative complaint, the attachments to its complaint, and the appendix to Defendants' motion to dismiss insofar as the exhibits in the appendix are referenced in the complaint and central to Plaintiff's claims. *See Ironshore Eur. DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019).

[3] Throughout this Order, "PBM" means pharmacy benefit manager or pharmacy benefit managing.

to 'devote his best efforts, business judgment, skill and knowledge exclusively to the advancement of the business interests of'" Plaintiff. *Id.* ¶ 16. Further, he agreed that he would not "cause [Plaintiff] or any of its affiliates to . . . enter into any contract" "without the consent of a Manager of" Plaintiff. Doc. 17-1, Defs.' App., 2. Additionally, Opalich agreed that while serving as CEO, he would "keep all Confidential Information in a fiduciary capacity for the sole benefit of [Plaintiff] and its affiliates" and return confidential information upon termination. *Id.* at 8.

Section 9 of the Opalich Agreement also contains several relevant "[p]ost-[t]ermination" covenants. *See id.* at 7–8. First, Opalich agreed that for five years "immediately after the termination of his employment for any reason," he would not disclose or use Plaintiff's confidential information for any purpose, such as to solicit business for the provision of services similar to those of Plaintiff. *Id.* at 8. Additionally, Opalich signed nonsolicitation and noncompete covenants that were triggered "after the termination of his employment for any reason[.]" *Id.* The nonsolicitation and noncompete covenants prohibited Opalich from, among other things, "solicit[ing] . . . any Account for the purpose of selling or providing to the Account products or services of the same or similar kind as provided by [Plaintiff] and its affiliates" and "becom[ing] interested in a Person engaged in a business that is the same or similar to [Plaintiff's business] . . . in any . . . capacity, for any purpose prohibited by [the nonsolicitation covenant.]" *Id.* at 8–9.

The nonsolicitation and noncompete covenants endure "for a period of time equal to the period during which [Opalich] is receiving payments under Section 4[d] equal to the Annual Base Salary[.]" *Id.* at 8. Section 4[d] provides that if Opalich is terminated without cause or resigns for good reason:

then during the 12-month period commencing on the date of such termination (or such shorter period equal to the remainder of the [term of the Opalich Agreement] if such termination occurs when there is less than [twelve] months remaining in the [t]erm), [Opalich] shall be entitled to receive the annual Base Salary, in each case payable by [Plaintiff] in regular installments in accordance with [Plaintiff's] general payroll practices[.]

*Id.* at 3. But the noncompete and nonsolicitation provisions are also subject to a tolling provision, which states that if Opalich "breaches any of his obligations under this Section 9, then any time period set forth in [the Opalich Agreement], including the periods set forth in this Section 9, will be deemed tolled as of the time of such breach and will remain tolled until such breach ceases to exist." *Id.* at 9.

2.    The Radcliff Agreement

"On or about July 1, 2020, [Plaintiff] hired Radcliff to serve as its Executive Vice President of Hospice PBM Division pursuant to an Employment Agreement (the 'Radcliff Agreement')." Doc. 5, Am. Compl., ¶ 22. The Radcliff Agreement contains a few covenants relevant here. First, Radcliff agreed to "devote [her] full business energies, interest, abilities and productive time to the proper and efficient performance of [her] duties[.]" Doc. 17-1, Defs.' App., 31. Additionally, she agreed that for twelve months following her termination, she would not "use confidential information to solicit or attempt to solicit the business of any client or customer of [Plaintiff] with respect to products, services, or investments similar to those provided or supplied by" Plaintiff. *Id.* at 32. She also agreed that "[d]uring" her employment with Plaintiff, she would not "acquire, assume or participate in, directly or indirectly, any position, investment or interest known by [her] to be adverse or antagonistic to [Plaintiff], or in any company, person, or entity that is, directly or indirectly, in competition with" Plaintiff. *Id.* at 31–32.

- 4 -

3.    The alleged misconduct and formation of HospisRX

Plaintiff alleges several instances of misconduct by Opalich and Radcliff during and after their terms of employment.

First, "from February 2019 through September 2020, Opalich forwarded dozens of emails containing [Plaintiff's] confidential information to his personal email accounts." Doc. 5, Am. Compl., ¶ 28. After sending confidential information to his personal accounts, "Opalich sent an email from his [work] email address to Stephen Greene, the Managing Member of Crevice, with the subject line 'Personal & Confidential.'" *Id.* ¶ 29. Plaintiff alleges that in the email, "Opalich disclosed to Greene confidential information he had learned while working for" Plaintiff. *Id.*[4] This email initiated "a series of communications between Opalich and Greene, in which Opalich repeatedly disclosed [Plaintiff's] confidential information to Greene[.]" *Id.* For example, Plaintiff alleges Opalich sent Greene an email containing "several highly sensitive and confidential documents" on August 20, 2020. *Id.* ¶ 32. Plaintiff alleges that four days later, "Opalich caused [Plaintiff] to enter into a Mutual Non-Disclosure Agreement (the 'MNDA') with Crevice," which was a "sham" agreement "designed to create the appearance that Opalich's repeated disclosure of [Plaintiff's] confidential information to Crevice was done for a legitimate purpose." *Id.* ¶ 33. After execution of the MNDA, Opalich disclosed more confidential information to Greene, including Plaintiff's financials, a hospice company that Plaintiff had been negotiating with, and confidential documents of Plaintiff. *Id.* ¶¶ 33–36.

Additionally, Plaintiff alleges that "[o]n August 17, 2020, Opalich sent Radcliff a draft Consulting Services Agreement between himself and a Crevice affiliate and directed Radcliff to '[b]e

---

[4] Defendants contend this information was public. Doc. 16, Defs.' Br., 20–21.

creative.'" *Id.* ¶ 31. But "Opalich never disclosed" any consulting arrangement to Plaintiff. *Id.* ¶ 41.

Although unaware of the misconduct detailed above, Plaintiff terminated Opalich's employment in September 2020. *Id.* ¶ 38. On November 6, 2020, Opalich and Plaintiff entered a severance agreement ("the Severance Agreement") that required Plaintiff to pay Opalich a one-time separation payment of $71,108.26. *Id.* ¶¶ 39, 42. As part of the Severance Agreement, Opalich submitted an affidavit admitting he had copied Plaintiff's confidential information to external hard drives and emailed it to personal email accounts during his employment. *Id.* ¶ 40. But he "certified . . . that he did not misuse [Plaintiff's] confidential information" or disclose it to third parties and that he had returned, destroyed, and deleted any confidential information of Plaintiff. *Id.* After the execution of the Severance Agreement, Opalich "wiped all information from his . . . company computer and reset the computer to its factory settings before returning it to [Plaintiff.]" *Id.* ¶ 43.

Following Opalich's termination, Plaintiff alleges that in "December 2020, . . . Opalich solicited one of [Plaintiff's] clients [(Ascend)] to participate in a new hospice pharmacy benefit management company that Opalich represented he was in the process of forming." *Id.* ¶ 46. In addition, Plaintiff claims "Opalich stated that he intended to hire [Plaintiff's] top sales representative and steal all of [Plaintiff's] business." *Id.*

Then, "[o]n February 23, 2021, Greene sent an email to Opalich, Radcliff, HealthView's [President], Sandy Roberson, and another individual with the subject line 'NewCo Hospice PBM'" (hereinafter "the Email"). *Id.* ¶ 47.[5] Attached to the Email was a document titled "NewCo Hospice PBM Opportunity – Key Considerations." *Id.* In the attachment, Greene outlined a plan to create

---

[5] Greene inadvertently sent the Email to Opalich's email account with Plaintiff. Doc. 16, Defs.' Br., 1.

a PBM entity in which Opalich would serve as CEO and Radcliff would serve as President and Chief Operating Officer. *Id.* ¶ 48. Crevice and HealthView would be investors in the new venture and receive a fifty-percent equity interest. *Id.* The plan also mentions a "[c]ontractual arrangement with" Ascend, one of Plaintiff's clients, "for pharmacy network, claims adjudication and coupon aggregation at [$1.00] per claim." Doc. 5-1, Ex. to Am. Compl., 3. Plaintiff alleges these "are some of the same services [Plaintiff] had long provided for" Ascend pursuant to a contract (hereinafter "the Ascend Agreement"). Doc. 5, Am. Compl., ¶ 48. The plan also provided Ascend with a five-percent equity interest "as an apparent inducement for [Ascend] to cease business with [Plaintiff] and enter into a contractual arrangement" with the new company. *Id.*

On March 4, 2021, Radcliff emailed Plaintiff's current CEO to resign from her position with Plaintiff. *Id.* ¶ 49. According to Plaintiff, it "later learned that Radcliff was performing consulting services for a different company while she was still employed by [Plaintiff], and that she failed to pursue numerous client referrals and new business opportunities for [Plaintiff.]" *Id.* ¶ 45.

Then, on March 12, 2021, Crevice and HealthView formed the new PBM entity—HospiceRX—as a Delaware LLC. *Id.* ¶ 51. A few days later, Greene emailed Plaintiff "on behalf of Opalich, Radcliff, Crevice, and HealthView," explaining that though they were all "pursuing a new 'business venture,'" the venture "was not 'explicitly focused on competing with'" Plaintiff. *Id.* ¶ 52.

B.    *Procedural Background*

Plaintiff filed suit in this Court on March 29, 2021. *See generally* Doc. 1, Compl. In its operative complaint, Plaintiff asserts the following claims: (1) breach of contract against Opalich and Radcliff, Doc. 5, Am. Compl., ¶¶ 54–59, 70–74; (2) breach of fiduciary duty against Opalich and

Radcliff, *id.* ¶¶ 60–63, 75–78; (3) fraudulent inducement against Opalich, *id.* ¶¶ 64–69; and (4) tortious interference with contract against the Entity Defendants. *Id.* ¶¶ 79–82.

On May 19, 2021, Plaintiff filed a motion for preliminary injunction (Doc. 13). Shortly thereafter, Defendants filed a motion to dismiss (Doc. 15). The motion seeks dismissal of all claims for failure to state a claim, as well as dismissal of the claim against the Entity Defendants for lack of personal jurisdiction. Doc. 15, Defs.' Mot., 1. The Court set a hearing for July 16, 2021, to consider the motion to dismiss and motion for preliminary injunction. Doc. 22, Order, 1–2.

At the hearing, the Court heard evidence and oral argument. The Court ruled that it lacks personal jurisdiction over the Entity Defendants and that Plaintiff was not entitled to jurisdictional discovery. Further, the Court denied Plaintiff's motion for a preliminary injunction.

Below, the Court turns to the only outstanding issue: whether Plaintiff's remaining claims against Defendants are subject to dismissal for failure to state a claim upon which relief may be granted.

## II.

## LEGAL STANDARD

A.   *Motion to Dismiss for Failure to State a Claim*

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). If a plaintiff's complaint fails to state such a claim, Rule 12(b)(6) allows a defendant to file a motion to dismiss. Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (citation omitted).

The Court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999) (citation omitted).

To survive a motion to dismiss, a plaintiff "must plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby*, 547 U.S. 10, 12 (2014). That means "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* When well-pleaded facts fail to meet this standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (quotation marks and alterations omitted).

### III.

### ANALYSIS

Below, the Court examines whether Plaintiff states a claim for each claim set forth in the operative complaint. The Court examines the sufficiency of Plaintiff's allegations only to the extent they are challenged by Defendants.[6]

---

[6] The Court need not examine the tortious-interference claim, as the Court already dismissed this claim for lack of personal jurisdiction over the Entity Defendants by holding, at the hearing, that it lacked personal jurisdiction over the Entity Defendants.

A.    *The Court Denies Defendants' Motion to Dismiss the Breach-of-Contract Claim Against Opalich.*

Under Texas law, the elements of a breach-of-contract claim are: (1) "the existence of a valid contract," (2) "performance or tendered performance by the plaintiff," (3) "breach by the defendant," and (4) "damages sustained as a result[.]" *Innova Hosp. San Antonio, LP v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 731 (5th Cir. 2018).

Plaintiff alleges that Opalich breached the Opalich Agreement by: (1) "disclosing [Plaintiff's] confidential information and using it for his own and others' benefit"; (2) "failing to return [Plaintiff's] confidential information upon the termination of his employment;" (3) "soliciting [Plaintiff's] clients and employees"; (4) "participating in a business that is in competition with [Plaintiff]"; and (5) "performing consulting services for a Crevice affiliate during his tenure with [Plaintiff.]" Doc. 5, Am. Compl., ¶ 58.

As a preliminary matter, Defendants advance arguments for dismissal of the breach-of-contract claim only with respect to the alleged breach of the noncompete and nonsolicitation provisions and Opalich's alleged consulting agreement with a third party. *See* Doc. 16, Defs.' Br., 18–19, 21–22. So the Court **DENIES** Defendants' motion to the extent they seek dismissal of the breach-of-contract claim against Opalich premised on his disclosure of, misuse of, and failure to return Plaintiff's confidential information.

The Court addresses the breach-of-contract claim with respect to the remaining allegations below.

1.    <u>Breaches of the noncompete and nonsolicitation covenants</u>

The breach-of-contract claim against Opalich for breach of the noncompete and

nonsolicitation covenants survives Defendants' motion. Defendants move to dismiss this claim by arguing Opalich's obligations under the covenants "terminated in November 2020" or, at the latest, February 1, 2021. Doc. 16, Defs.' Br., 18–19. Defendants' argument is a multi-step contractual interpretation argument as follows.

First, the Opalich Agreement "states that the noncompete and nonsolicitation provisions survive for the length that termination payments are to be paid" under Section 4[d]. Doc. 16, Defs.' Br., 18 (citing Doc. 17-1, Defs.' App., 8). Section 4[d] of the Opalich Agreement states:

> [I]f [Opalich's] employment is terminated by [Plaintiff] without Cause, or if [Opalich] resigns for Good Reason, then during the 12-month period commencing on the date of such termination (or such shorter period equal to the reminder of the Term if such termination occurs when there is less than twelve (12) months remaining in the Term), [Opalich] shall be entitled to receive the annual Base Salary[.]

Doc. 17-1, Defs.' App., 3.[7] Reading these two provisions together, Defendants assert that "Opalich had no obligations under the [covenants at issue] as of February 1, 2021." Doc. 16, Defs.' Br., 19.

Defendants then assert that the covenants were further "reduced after negotiation of the Severance Agreement such that they terminated in November 2020." *Id.*; *see also* Doc. 17, Defs.' App., 15–16, 25 (providing Opalich with a "lump sum amount of $71,108.26" in November 2020). According to Defendants, because Plaintiff's allegations against Opalich "relat[ing] to violations of the nonsolicitation/noncompete agreements pertain to events that occurred . . . on or after February 23, 2021," Plaintiff's breach-of-contract claim against Opalich fails. Doc. 16, Defs.' Br., 19.

Plaintiff, on the other hand, contends that the nonsolicitation and noncompete covenants

---

[7] The parties agree that because there were less than twelve months remaining in Opalich's term, the relevant date here would be February 1, 2021. *See* Doc. 16, Defs.' Br., 6; Doc. 29, Pl.'s Resp., 14.

are still in effect. Plaintiff first argues that the covenants "endure for a period equal to the time Opalich *would be entitled* to receive severance payments"—not for the time period that Plaintiff actually paid severance. Doc. 29, Pl.'s Resp., 13–14 (emphasis added). In support, Plaintiff points out that Section 9[b] provides that the covenants survive "for a period of time equal to the period during which [Opalich] is receiving payments under Section 4[d] equal to the Annual Base Salary, after the termination of his employment for any reason[.]" *Id.* at 14 (emphasis omitted) (quoting Doc. 17-1, Defs.' App., 3). Since Section 9[b] covers the duration of the nonsolicitation and noncompete provisions when Opalich is terminated "for any reason," but Section 4[d] provides that Opalich is entitled to severance payments only if he is terminated "without Cause" or if he resigns for "Good Reason," Doc. 17-1, Defs.' App., 3, 8, Plaintiff argues that the parties intended the nonsolicitation and noncompete covenants to "last for the amount of time he would have been entitled to receive severance payments under Section 4(d)[.]" Doc. 29, Pl.'s Resp., 14. Based on this interpretation, Plaintiff contends the covenants were in effect until February 1, 2021. *Id.* Plaintiff then argues that the provisions were tolled pursuant to a tolling provision in the Opalich Agreement "until [Opalich] ceased breaching them (which he has not)." *Id.* Defendants fail to address this tolling provision. *See generally* Doc. 16, Defs.' Br.; Doc. 32, Defs.' Reply, 6–7.

Whether or not the covenants survived beyond November 2020 is a fact issue ill-suited for a motion to dismiss, so the Court denies Defendants' motion to dismiss this claim. Defendants' argument that Plaintiff's payment of a lump sum terminated the nonsolicitation and noncompete provisions in November 2020 is dubious. Specifically, Defendants fail to explain how the lump sum payment constitutes "the annual Base Salary, in each case payable by [Plaintiff] in regular installments . . . ." Doc. 17-1, Defs.' App., 3. Nevertheless, the plain language of the Opalich

Agreement states that his noncompete and nonsolicitation clauses survive for the "period of time equal to the period during which [Opalich] *is receiving* payments under Section 4[d.]" Doc. 17-1, Defs.' App., 8 (emphasis added). If Opalich never received these payments post-termination, the plain language of the Opalich Agreement suggests that the covenants do not survive past Opalich's termination.

But Plaintiff has raised the tolling provision of the Opalich Agreement, and the Court lacks the evidence and briefing necessary to determine whether the covenants were tolled. If the covenants were tolled beyond November 2020, Plaintiff may have a claim for breach of the covenants. Namely, Plaintiff alleges that in December 2020, Opalich "solicited one of [Plaintiff's] clients to participate in a new hospice pharmacy benefit management company that Opalich represented he was in the process of forming" and "contacted an investment company . . . to solicit investments for the new hospice pharmacy benefit management company." Doc. 5, Am. Compl., ¶ 46. These allegations, if true, likely constitute violations of the noncompete and nonsolicitation covenants. *See* Doc. 17-1, Defs.' App., 8–9.

Accordingly, Defendants have not shown that Plaintiff's breach-of-contract claim premised on the nonsolicitation and noncompete provisions is subject to dismissal, and the Court **DENIES** Defendants' motion to dismiss the claim.

 2. <u>Breach based on the consulting arrangement</u>

The breach-of-contract claim against Opalich based on the consulting services is sufficiently pleaded. In support of their motion to dismiss this claim, Defendants attach a copy of the consulting agreement referenced by Plaintiff, *see* Doc. 5, Am. Compl., ¶ 31, and explain that the agreement, by its terms, was for performance in August 2017. *See* Doc. 17-1, Defs.' App., 44. Nevertheless, Plaintiff

points out that Defendants provide no explanation for Opalich's email to Radcliff, which contained attachments of the agreement and instructions to "[b]e creative." Doc. 5, Am. Compl., ¶ 31.

Plaintiff sufficiently pleads its breach-of-contract claim insofar as it alleges a breach based on Opalich's consulting engagement. Plaintiff has provided a specific factual basis for its allegation of a breach of the Opalich Agreement: Opalich's email of a draft consulting agreement to Radcliff in which Opalich states, "[b]e creative." *Id.* Taking Plaintiff's allegations of the consulting arrangement as true, they plausibly suggest that Opalich breached the Opalich Agreement—Plaintiff has "provide[d] 'more than an unadorned accusation devoid of factual support[.]'" *Monitronics Int'l, Inc. v. Skyline Sec. Mgmt. Inc.*, 2017 WL 2882624, at \*4 (N.D. Tex. July 5, 2017) (citation omitted).

Thus, the Court **DENIES** Defendants' motion to dismiss the breach-of-contract claim premised on the alleged consulting services. *See, e.g.*, *id.* at \*3 (rejecting the defendants' argument that the plaintiff failed to state a breach-of-contract claim due to a lack of "sufficient details regarding the nature" of the alleged breach).

B.   *The Court Denies Defendants' Motion to Dismiss the Breach-of-Fiduciary-Duty Claim Against Opalich.*

"The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)).

Similar to its breach-of-contract claim, Plaintiff alleges a breach-of-fiduciary-duty claim against Opalich for "performing consulting services"; "disclosing [Plaintiff's] confidential information

and using it for his own and others' benefit"; "soliciting [Plaintiff's] clients and employees"; "and forming a business to compete with [Plaintiff.]" Doc. 5, Am. Compl., ¶ 62.

Defendants move to dismiss the breach-of-fiduciary-duty claim against Opalich on the ground that Plaintiff's allegations "are untrue." Doc. 16, Defs.' Br., 19. Specifically, Defendants again argue that: (1) Opalich did not engage in the consulting arrangement, and (2) the noncompete and nonsolicitation provisions of the Opalich Agreement expired in November 2020. *Id.* at 19–20. In accordance with the breach-of-contract discussion above, the Court rejects both arguments as bases for dismissal.

Defendants' only new argument is that Plaintiff's allegations do not "support the notion of improper disclosure and use of Plaintiff's information," because Opalich disclosed Plaintiff's confidential information "pursuant to the MNDA." *Id.* at 19. But Plaintiff alleges that on at least one occasion, Opalich disclosed Plaintiff's confidential information prior to the entry of the MNDA. *See* Doc. 5, Am. Compl., ¶¶ 32–33. The Court thus rejects this argument as well.

Consequently, the Court **DENIES** Defendants' motion to dismiss the breach-of-fiduciary-duty claim against Opalich.[8]

C.     *The Court Grants in Part and Denies in Part Defendants' Motion to Dismiss the Fraudulent-Inducement Claim Against Opalich.*

"Fraudulent inducement is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." *IAS Servs. Grp., L.L.C. v. Jim*

---

[8] In their reply brief, Defendants raise a new argument—that any duty Opalich owed Plaintiff "ended on September 15, 2020, when Plaintiff terminated Mr. Opalich's employment." Doc. 32, Defs.' Reply, 8. Defendants failed to raise this argument in their motion, so the Court will not consider it now. *See generally* Doc. 16, Defs.' Br.

*Buckley & Assocs., Inc.*, 900 F.3d 640, 647 (5th Cir. 2018) (citation and quotation marks omitted).

> To state a claim for fraudulent inducement, a plaintiff must plausibly plead facts establishing that: (1) the other party made a material misrepresentation, (2) the representation was false and was either known to be false when made or was made without knowledge of the truth, (3) the representation was intended to be and was relied upon by the injured party, and (4) the injury complained of was caused by the reliance.

*Id.* (citation and quotation marks omitted); *see also Ibe v. Jones*, 836 F.3d 516, 525 (5th Cir. 2016) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990)). Federal Rule of Civil Procedure 9(b) "require[s] that fraud be pleaded with 'particularity.'" *IAS Servs.*, 900 F.3d at 647 (quoting Fed. R. Civ. P. 9(b)). Accordingly, the plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (citation omitted); *see also U.S. ex re. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005).

Here, Plaintiff alleges Opalich fraudulently induced Plaintiff to enter the Severance Agreement by misrepresenting that: (1) "he did not misuse [Plaintiff's] confidential information during his employment"; (2) "he returned all of [Plaintiff's] confidential information"; (3) "he destroyed and permanently deleted all of [Plaintiff's] confidential information from any personal devices and email accounts"; and (4) "he did not . . . disclose any of [Plaintiff's] confidential information to any third parties." Doc. 5, Am. Compl., ¶ 65.

Defendants move to dismiss this claim due to Plaintiff's failure "to state what specific statements were made and how they were fraudulent in this case." Doc. 16, Defs.' Br., 20. As explained below, the Court denies Defendants' motion as to misrepresentations (1) and (4) and

grants the motion as to misrepresentations (2) and (3).

> 1.    Misrepresentations (1) and (4)

Regarding misrepresentations (1) and (4), Plaintiff alleges that in conjunction with the Severance Agreement, Opalich "executed an affidavit" indicating that "he did not misuse [Plaintiff's] confidential information during his employment" or "disclose any of [Plaintiff's] confidential information to any third parties." Doc. 5, Am. Compl., ¶¶ 40, 65. Plaintiff further alleges these representations were false because, among other reasons, "Opalich had previously disclosed [Plaintiff's] confidential information to Crevice" both before and after entering the MNDA. *Id.* ¶ 41; *see id.* ¶¶ 32–33. Plaintiff further alleges the MNDA was "a sham designed to create the appearance that Opalich's repeated disclosure of [Plaintiff's] confidential information to Crevice was done for a legitimate purpose." *Id.* ¶ 33. These allegations, taken together, plausibly allege that Opalich misused and disclosed confidential information, as well as provide the "who, what, when, where, and how" of the two misrepresentations. *See Bell Helicopter*, 417 F.3d at 453 (citation omitted).

The Court thus **DENIES** Defendants' motion to dismiss the fraudulent-inducement claim premised on misrepresentations (1) and (4).

> 2.    Misrepresentations (2) and (3)

As to misrepresentation (2), Plaintiff alleges that on November 6, 2020, Opalich "expressly represented that he had returned all of [Plaintiff's] confidential information[.]" Doc. 5, Am. Compl., ¶¶ 39, 65. Plaintiff contends this representation was false, but it does not explain why. *See id.* ¶ 41. Because Rule 9(b) requires a plaintiff alleging fraudulent inducement to explain why the alleged statement was fraudulent, the Court finds the fraudulent-inducement claim insufficiently pleaded insofar as it relies on misrepresentation (2). *See, e.g., Sharp Mexican Partners, LP v. Republic Waste*

- 17 -

*Servs. of Tex., Ltd.*, 2018 WL 4053365, at *4 (N.D. Tex. Aug. 24, 2018) (citation omitted).

Finally, alleged misrepresentation (3) is Opalich's statement in his affidavit "that he destroyed and permanently deleted all of [Plaintiff's] confidential information from any personal devices and email accounts[.]" Doc. 5, Am. Compl., ¶¶ 40, 65. Again, however, Plaintiff does not allege why this representation was false. The Court thus finds the fraudulent-inducement claim insufficiently pleaded with respect to misrepresentation (3), too.

Accordingly, the Court **GRANTS** Defendants' motion to dismiss the fraudulent-inducement claim premised on misrepresentations (2) and (3).

D.    *The Court Grants in Part and Denies in Part Defendants' Motion to Dismiss the Claims Against Radcliff.*

Plaintiff alleges Radcliff breached the Radcliff Agreement and fiduciary duties owed to Plaintiff by: (1) "performing consulting services for a third-party and receiving undisclosed outside compensation"; (2) "participating in a company that is in competition with" Plaintiff; and (3) "using [Plaintiff's] confidential information to solicit [Plaintiff's] clients and potential clients." Doc. 5, Am. Compl., ¶¶ 73, 77.[9]

Defendants move to dismiss Plaintiff's breach-of-contract and breach-of-fiduciary-duty claims as conclusory. Doc. 16, Defs.' Br., 23–24. Because these claims are based on identical conduct, the Court analyzes them jointly with respect to each alleged breach.

1.    Breaches based on the consulting arrangement

Plaintiff's claims against Radcliff based on the consulting relationship are insufficiently

---

[9] The Court identified the elements of a breach-of-contract and breach-of-fiduciary-duty claim above. *See supra* Section III.A. & B.

- 18 -

pleaded. Plaintiff alleges that it "learned that Radcliff was performing consulting services for a different company while she was still employed by" Plaintiff. Doc. 5, Am. Compl., ¶ 45. This allegation, taken as true, plausibly suggests a violation of the Radcliff Agreement, under which Radcliff agreed to "devote [her] full business energies, interest, abilities and productive time to the proper and efficient performance of [her] duties[.]" Doc. 17-1, Defs.' App., 31; *see also* Doc. 5, Am. Compl., ¶ 23. But Plaintiff provides no context for this allegation of a consulting agreement; as a result, the complaint fails to provide fair notice with respect to the consulting arrangement. *See Gilbert v. Outback Steakhouse of Fla. Inc.*, 295 F. App'x 710, 713 (5th Cir. 2008) (per curiam) (citations omitted) (emphasizing that Rule 8 requires factual allegations sufficient to provide fair notice).[10]

Thus, the Court **GRANT**S Defendants' motion to dismiss the claims against Radcliff premised on the alleged consulting arrangement.

### 2.    Breaches based on participating in a competing company

Finally, the Court finds the claims against Radcliff sufficiently pleaded insofar as Plaintiff alleges a breach due to Radcliff's participation in a competing company. Plaintiff alleges that Radcliff was "planning to form" "a competing company" "with one of [Plaintiff's] longtime clients." Doc. 5, Am. Compl., ¶ 45. Plaintiff further alleges that Greene sent Radcliff, among others, the Email outlining the plan for this new company on February 23, 2021—before Radcliff resigned from her position with Plaintiff. *See id.* ¶¶ 48–49. This plan detailed that Radcliff would serve as "President

---

[10] Plaintiff argues that evidence submitted by Defendants in response to Plaintiff's motion for preliminary injunction substantiates Plaintiff's claim that Radcliff entered a consulting arrangement. Doc. 29, Pl.'s Resp., 18–19. But the Court does not consider this evidence in deciding a motion to dismiss. *See Ironshore*, 912 F.3d at 763.

and Chief Operating Officer" and that the company would have a "[c]ontractual arrangement with" Ascend. Doc. 5-1, Ex. to Am. Compl., 3. These factual allegations are sufficient to put Radcliff on notice of the alleged breach.

The Court thus **DENIES** Defendants' motion to dismiss the breach-of-contract and breach-of-fiduciary-duty claims premised on Radcliff's participation in a competing company.

> 3.    Breaches based on the use of confidential information

Insofar as Plaintiff asserts claims against Radcliff based on her disclosure of confidential information, it has not sufficiently pleaded these claims. Plaintiff provides no facts or context for its allegation that Radcliff "us[ed] [Plaintiff's] confidential information to solicit [Plaintiff's] clients and potential clients[.]" *See* Doc. 5, Am. Compl., ¶¶ 73, 77.

Accordingly, the Court **GRANTS** Defendants' motion to dismiss the breach-of-contract and breach-of-fiduciary-duty claims premised on Radcliff's disclosure of confidential information.

E.    *The Court Grants Plaintiff Leave to Amend.*

Plaintiff requests that the Court provide it with leave to amend if the Court finds any of its claims insufficiently pleaded. Doc. 29, Pl.'s Resp., 19–20. Because this is the Court's first opportunity to assess the sufficiency of Plaintiff's allegations, the Court **GRANTS** Plaintiff leave to amend its complaint to remedy the deficiencies noted in this Order.[11]

## IV.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART**

---

[11] Plaintiff may elect not to remedy these deficiencies. Either way, Plaintiff must file an amended complaint in light of the Court's dismissal of the claim against the Entity Defendants.

Defendants' motion to dismiss for failure to state a claim (Doc. 15). The Court further **GRANTS**

Plaintiff one opportunity to amend its complaint to remedy the deficiencies noted in this Order.

Plaintiff must file its amended complaint within **FOURTEEN (14)** days of this Order.


SO ORDERED.

SIGNED: July 23, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE