UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EHO360 LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-0724-B |
| | § | |
| NICHOLAS OPALICH and TAMMY | § | |
| RADCLIFF, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Nicholas Opalich and Tammy Radcliff's Motion for Summary Judgment (Doc. 105). For the following reasons, the Court **DENIES** Defendants' Motion.

## I.

## BACKGROUND

This dispute concerns the conduct of two executives, Nicholas Opalich and Tammy Radcliff, during and after their employment with Plaintiff EHO360 LLC ("EHO"). EHO alleges Defendants breached their contractual and fiduciary duties, stole EHO's confidential information, and used the information to start a competing business. *See* Doc. 42, Second Am. Compl., ¶ 1.

A.     *EHO Hires Opalich and Radcliff*

EHO is a Pharmacy Benefits Management company and a claims processor. Doc. 106, Defs.' Br. Supp., 8. In short, EHO manages prescription claims, consolidates billing for clients, and serves as a "connector[] between employers, payers, patients, consumers, members/workers, drug wholesalers, pharmacies, and drug companies." *Id.* at 8 & n.2. On February 1, 2019, EHO hired

Opalich as its Chief Executive Officer ("CEO"). *See* Doc. 114, Pl.'s App., 71–82. Opalich and EHO entered into an Executive Employment Agreement (the "Opalich Agreement"),[1] which detailed the terms of Opalich's employment. *See generally id.* Opalich was to receive $275,000 base salary under the contract. *Id.* at 72.

> The Opalich Agreement contained a termination provision ("Section 4(d)") that stated:
>
> Beginning on August 1, 2019, if Executive's employment is terminated by Employer without cause or if Executive resigns for Good Reason, then during the 12-month period commencing on the date of such termination (or such shorter period equal to the remainder of the Term if such termination occurs when there is less than twelve (12) months remaining in the Term), Executive shall be entitled to receive the annual Base Salary . . . .

*See id.* Thus, "if Opalich was terminated without cause, he would be paid a severance of the Base Salary for the lesser of 12 months or the balance of the Term of the Opalich Agreement (which was set to end on February 1, 2021)." Doc. 106, Defs.' Br. Supp., 10. Opalich would also be subject to confidentiality, non-solicitation, and non-compete provisions while receiving payments under Section 4(d). Doc. 114, Pl.'s App., 76–78. These provisions were outlined in Section 9 of the Opalich Agreement. *Id.*

Opalich met Radcliff, a consultant for a specialty pharmaceutical company called KemPharm, in March 2020 at a conference. Doc. 106, Defs.' Br. Supp., 11. Shortly after, Opalich began recruiting Radcliff to join EHO and lead the company's hospice division. Doc. 113, Pl.'s Resp. Br., 4; Doc. 114, Pl.'s App., 83. Opalich enlisted Cindy Kepler, a marketing consultant, to help Radcliff create a presentation for EHO's board "[o]n where she believes she can have an immediate impact for EHO." Doc. 114, Pl.'s App., 83; Doc. 113, Pl.'s Resp. Br., 4–5. The end

---

[1] The Opalich Agreement was executed between Opalich and an EHO affiliate, SPCGT Management, LLC ("SPCGT"). Doc. 42, Second Am. Compl., ¶ 15. SPCGT then "assigned all its rights under the Opalich Agreement to EHO." *Id.*

product contained a business plan "with short-term and long-term hospice business opportunities Radcliff would pursue if she was hired by EHO." Doc. 113, Pl.'s Resp. Br., 5; Doc. 114, Pl.'s App., 186. Radcliff presented this to EHO's board in April 2020. Doc. 113, Pl.'s Resp. Br., 5; Doc. 114, Pl.'s App., 21–24. Kepler invoiced EHO for her work on the presentation. Doc. 113, Pl.'s Resp. Br., 5; Doc. 114, Pl.'s App., 362–63.

Following the April presentation, Opalich, Radcliff, and Kepler continued working on this hospice business plan and financial model (the "Hospice Business Plan"). Doc. 113, Pl.'s Resp. Br., 5; Doc. 114, Pl.'s App., 21–24. Kepler again invoiced this work to EHO. Doc. 113, Pl.'s Resp. Br., 5; Doc. 114, Pl.'s App., 362–63. After Radcliff presented the Hospice Business Plan to the board in June, the board offered Radcliff the role of Executive Vice President of EHO's hospice division. Doc. 113, Pl.'s Resp. Br., 6; Doc. 114, Pl.'s App., 192. Radcliff's offer letter stated that she would be paid commissions on "the gross margin of all new business directly attributable to [her] efforts," and EHO would use the Hospice Business Plan "as the basis for new growth." Doc. 114, Pl.'s App., 425–26.

Radcliff then traveled to Austin, Texas to meet with EHO's board. *Id.* at 193. Radcliff claims that, while she was in Austin, she notified the board that she would continue to consult for KemPharm as an EHO employee. Doc. 106, Defs.' Br. Supp., 13; Doc. 114, Defs.' App., 137–38. EHO contests this and claims Radcliff told the board "her consulting agreement was expiring and she would no longer be consulting for KemPharm after she joined EHO." Doc. 114, Pl.'s App., 317–19, 347. Further, EHO states it would not have hired Radcliff had it known she intended to continue working for KemPharm. *See id.* at 347–48. After Radcliff's trip to Austin, EHO sent her an employment agreement (the "Radcliff Agreement"), which she signed on July 8, 2020. *Id.* at 195–204.

The Radcliff Agreement included several restrictive covenants governing Radcliff's actions. Radcliff was to "devote [her] full business energies, interest, abilities and productive time to the proper and efficient performance of [her] duties." *Id.* at 195. She could not "acquire, assume or participate in . . . any position, investment or interest . . . adverse or antagonistic to [EHO] . . . or any company, person, or entity . . . in competition with . . . [EHO]." *Id.* Further, the Radcliff Agreement included confidentiality and non-solicitation provisions similar to those in the Opalich Agreement. *Id.* at 196, 201–02.

Upon hiring Radcliff, EHO began pursuing the strategies highlighted in the Hospice Business Plan. Capital City/Queen City, hospice organizations identified in the Hospice Business Plan, inquired about EHO's pricing for hospice-related drugs. *Id.* at 25–26. Capital City/Queen City provided documentation on their current vendor's pricing, which EHO used to create "reprice" spreadsheets and a PowerPoint presentation (the "Reprice Spreadsheets"), indicating what it would charge for similar services. *Id.* Capital City/Queen City and EHO did not have a nondisclosure agreement in place when this information was exchanged. *Id.* at 26. EHO also pursued the business of Ohio Health Hospice & Palliative Medicine ("Ohio Health"). Doc. 113, Pl.'s Resp. Br., 9; Doc. 114, Pl.'s App., 386. EHO engaged a consulting company called Profero to prepare a proposal for Ohio Health's business (the "Ohio Health Proposal"). Doc. 114, Pl.'s App., 386. However, EHO did not win Ohio Health's business. *Id.*

Later, in August 2020, Opalich engaged a long-time acquaintance, Stephen Greene of Crevice Capital Partners, LLC ("Crevice"), to discuss potentially investing in EHO. Doc. 107, Defs.' App., 200. Crevice and EHO eventually entered into a nondisclosure agreement, and Opalich began providing EHO's confidential information to Greene. *Id.* at 200–02. However, the parties dispute whether Opalich provided Greene with confidential information prior to the

execution of the nondisclosure agreement. *See* Doc. 106, Defs.' Br. Supp., 17–18; Doc. 113, Pl.'s Resp. Br., 9–10. EHO also claims Opalich caused EHO to enter into the nondisclosure agreement without prior approval from the board. Doc. 113, Pl.'s Resp. Br., 10; Doc. 114, Pl.'s App., 296–98.

B.    *EHO Terminates Opalich*

On September 15, 2020, EHO terminated Opalich's employment. Doc. 114, Pl.'s App., 301. EHO stated several reasons for his termination. First, EHO alleges Opalich had been "belligerent and rude to EHO's board members." *Id.* at 301–05. Second, EHO alleges Opalich had "signed contracts without requisite approval." *Id.* Finally, EHO alleges Opalich lied about his criminal record. *Id.* Months prior, EHO began the process of obtaining licensure in various states, which required the company executives to complete a Uniform Certificate of Authority Application Biographical Affidavit. *Id.* at 308–09. The certificate required the executives to consent to a background check. *Id.* at 641. The background check revealed Opalich had previously been charged with and pleaded guilty to a felony tax charge. *Id.* at 308–09. Opalich did not disclose this on the certificate when asked if he had been been "charged with, or pleaded guilty to, any criminal offense other than civil traffic offenses." Doc. 113, Pl.'s Resp. Br., 11; Doc. 114, Pl.'s App., 641. Upon his termination, Opalich was sent an email with a formal termination letter, which requested "that Opalich return his EHO computer and expressly directed him not to alter or delete anything from [his] computer." Doc. 113, Pl.'s Resp. Br., 11; Doc. 114, Pl.'s App., 324–35.

On October 8, 2020, Opalich returned his EHO laptop. Doc. 107, Defs.' App., 161. Before returning the laptop, Opalich, without EHO's knowledge or consent, performed a factory reset, which deleted the information on the computer. *Id.* at 236–38. Opalich claims he reset the computer to protect his personal information. *Id.* He also destroyed a hard drive he used while working for EHO. *Id.* at 238–39. On November 6, 2020, EHO and Opalich entered into a

Confidential Severance and General Waiver Agreement (the "Severance Agreement"). Doc. 114, Pl.'s App., 120–30. In the Severance Agreement, EHO agreed to pay Opalich a lump sum of $71,108.26, less than he was originally owed under the Opalich Agreement's termination provision. *See id.* at 121.

The parties dispute whether, in exchange for this lower sum, EHO agreed to remove "all post-employment competition covenants other than confidentiality." Doc. 106, Defs.' Br. Supp., 20. According to Opalich, his non-compete and non-solicitation obligations ended on November 30, 2020, the date he received the final severance payment. *Id.* EHO claims these restrictive covenants were unaffected by the Severance Agreement and are instead governed by Section 9(b) of the Opalich Agreement. Doc. 113, Pl.'s Resp. Br., 27–28.

The Severance Agreement also contained a lengthy confidentiality provision that stated Opalich could not "duplicate, use, download, possess, or store, and shall not forward, disclose, or transfer any confidential documents or [electronically stored information], or any 'Confidential Information', to [himself] or any person or entity, or use them for [his] own benefit or the benefit of anyone other than [EHO]." Doc. 114, Pl.'s App., 125–26. Along with the Severance Agreement, Opalich also executed an affidavit regarding confidential information. *Id.* at 131–32. Here, Opalich stated under oath that:

> (a) he would not use EHO's confidential information after the termination of his employment; (b) he had returned all of EHO's confidential information and would not retain copies or derivations of any Company records, documents, materials or information (including Confidential Information) (whether in hardcopy, on electronic media or otherwise); and (c) he permanently deleted and removed all electronic copies of any information (including Confidential information) that he had obtained during his employment from all his personal devices and destroyed all copies so that he could not access any of this information again in the future.

Doc. 113, Pl.'s Resp. Br., 12; Doc. 114, Pl.'s App., 131–33.

C.      *Opalich Continues Contact with Radcliff*

Opalich and Radcliff remained in contact after Opalich's termination from EHO. In October 2020, the pair exchanged texts regarding a new job opportunity for Radcliff outside of EHO. *See* Doc. 114, Pl.'s App., 658–59. Around the same time, Radcliff sent Opalich an email with the subject line "This helps your garden grow." *Id.* at 668. Attached to the email was the Ohio Health Proposal that EHO created to try and win Ohio Health's business. *Id.* Shortly after, Opalich sent Radcliff a budget for a new hospice Pharmacy Benefits Management company, which included a proposed start date and salary for Radcliff. *Id.* at 134–35. Opalich also sent Radcliff a spreadsheet titled "NOpalich Hospice FINC Assumptions." *Id.* at 136–38. The spreadsheet was identical to the Hospice Business Plan except that Opalich added the new company's budgetary information. *See id.* at 42–43. Notably, the spreadsheet still contained references to EHO. *See id.* at 140.

Opalich also sent this spreadsheet to Citizens Rx to try and persuade it to hire him and Radcliff to build a hospice Pharmacy Benefits Management division. *Id.* at 44. Radcliff was copied on Opalich's communications with Citizens Rx. *Id.* When Citizens Rx declined to hire Radcliff and Opalich, Opalich accepted the role of CEO at InfinityRx, another Pharmacy Benefits Management company. *Id.* at 45. There, Opalich lobbied InfinityRx to hire Radcliff and encouraged Radcliff to leave EHO to work at InfinityRx. *Id.* at 760, 846, 848.

While Opalich was employed by InfinityRx, he began discussions with Greene regarding the formation of a new hospice Pharmacy Benefits Management company named HospisRx. Doc. 106, Defs.' Br. Supp., 22; Doc. 107, Defs.' App., 163. Greene included C. Saunders Roberson, Jr., a healthcare private equity investor, in these conversations. *Id.* Opalich then introduced via email Radcliff, Greene, and Roberson to Andy Reeves, the CEO of Ascend, an EHO client. Doc. 106, Defs.' Br. Supp., 22; Doc. 114, Pl.'s App., 851, 853. On February 16, 2021, Greene, Roberson,

Radcliff, and Opalich had a call with Reeves to discuss a possible partnership between Ascend and HospisRx. Doc. 107, Defs.' App., 163. On March 3, 2021, Opalich sent the Reprice Spreadsheets created by EHO to Ascend to "acquaint Ascend with how repricing analyses were performed in the hospice industry." Doc. 106, Defs.' Br. Supp., 23; Doc. 107, Defs.' App., 245.

On February 11, 2021, Radcliff received an email from an employee at Profero, one of the consulting companies who assisted EHO on the Ohio Health Proposal, indicating that Ohio Health was again interested in selecting a new hospice Pharmacy Benefits Management vendor. Doc. 114, Pl.'s App., 387. Profero was under contract with EHO and intended to notify EHO, through Radcliff, that it could still win Ohio Health's business. *See id.* Radcliff then notified Opalich, who emailed Radcliff, Greene, and Roberson stating that Profero "want[ed] to swing business [their] way" and that the "deal [was] wide open and [theirs] for the taking." *Id.* at 149. However, the Profero employee denies any intention of sending business to Opalich and HospisRx. *Id.* at 388.

Radcliff resigned from EHO on March 4, 2021. *Id.* at 174. Greene, Roberson, Opalich, and Radcliff formed HospisRx, LLC on March 12, 2021. Doc. 113, Pl.'s Resp. Br., 20. Over the next few months, Radcliff and Opalich sent the versions of the Reprice Spreadsheet, the Ohio Health Proposal, and the Hospice Business Plan to various companies in an attempt to solicit business. *Id.* at 20–23.

EHO's Second Amended Complaint alleges Opalich and Radcliff "breached their contractual and fiduciary duties to EHO, pilfered EHO's confidential and proprietary information, and are using EHO's confidential and proprietary information to operate a competing business." Doc. 42, Second. Am. Compl., ¶ 1. After discovery, Defendants filed a Motion for Summary Judgment. *See* Doc. 105, Mot. Summ. J. Defendants allege that EHO cannot demonstrate any

breach occurred and cannot show any damages suffered. *See* Doc. 106, Defs.' Br. Supp., 1. The

Motion is fully briefed and ripe for review. The Court considers it below.

## II.

### LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"[T]he substantive law . . . identif[ies] which facts are material," and only a "dispute[] over facts

that might affect the outcome of the suit under the governing law will properly preclude the entry

of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must

view the facts and the inferences drawn from the facts "in the light most favorable to the [non-

movant]." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the summary-judgment movant has met its burden, "the non[-]movant must go

beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex Corp. v.

Catrett,* 477 U.S. 317, 325 (1986)). A non-movant may not simply rely on the Court to "sift

through the record" to find a fact issue, but must point to specific evidence in the record and

articulate precisely how that evidence supports the challenged claim. *Ragas v. Tenn. Gas Pipeline

Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Moreover, the evidence the non-movant provides must

raise "more than . . . some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at

586. The evidence must be such that a jury could reasonably find in the non-movant's favor.

*Anderson*, 477 U.S. at 248. If the non-movant is unable to make such a showing, the Court must

grant summary judgment. *Little*, 37 F.3d at 1076.

### III.

### ANALYSIS

EHO brings three claims against Opalich and two against Radcliff. Against Opalich, EHO alleges a breach of contract, breach of fiduciary duty, and fraudulent inducement claim. *See* Doc. 42, Second Am. Compl., ¶¶ 64–79. Against Radcliff, EHO alleges a breach of contract and breach of fiduciary duty claim. *See id.* ¶¶ 80–88. EHO seeks damages, attorneys' fees, and injunctive relief to remedy Defendants' alleged misconduct. *See id.* ¶¶ 89–98. Defendants argue in their Motion that discovery has revealed no facts to support EHO's claims. Doc. 106, Defs.' Br. Supp., 1. The Court addresses each claim in turn. After reviewing the evidence, the Court finds that EHO has demonstrated genuine disputes of material fact that preclude summary judgment on each claim. Thus, Defendants' Motion for Summary Judgment is **DENIED**.

A.    *Breach of Contract*

As this is a question of contract, this Court applies Texas choice-of-law rules. *See Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010). In Texas, contractual choice-of-law provisions are typically enforced unless the provision "violates a fundamental public policy of Texas." *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004). Both the Opalich Agreement and Radcliff Agreement contain Texas choice-of-law provisions. Doc. 114, Pl.'s App., 80, 202. And the Court is not aware of any public-policy concerns. Accordingly, this Court applies Texas law in interpreting the contract.

Under Texas law, "breach of contract requires four elements: (1) a valid contract, (2) plaintiff's performance, (3) defendant's breach, and (4) resulting damages." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 993 (5th Cir. 2019). The parties' intentions, as expressed in the contract, will govern the meaning of contractual terms. *Italian Cowboy Partners, Ltd. v. Prudential*

-10-

*Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). Courts must "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* (quotation omitted). Only elements three and four, whether Defendants breached the contract and whether that breach resulted in damages, are in dispute. The Court considers the breaches alleged against each defendant in turn and then turns to damages.

### 1.    Claim Against Opalich

The Court begins with the breach of contract claim against Opalich. EHO argues there are three alleged breaches where disputes of material fact preclude summary judgment. First, EHO alleges that Opalich breached the restrictive covenants in the Opalich Agreement by "performing consulting services for a third party during his tenure with EHO." Doc. 42, Second Am. Compl., ¶ 68. Second, EHO alleges Opalich "disclos[ed] EHO's confidential information . . . , solicit[ed] EHO's clients and employees, [and] participat[ed] in a business that is in competition with EHO." *Id.* Finally, EHO alleges Opalich "fail[ed] to return EHO's confidential information upon the termination of his employment." *Id.*

Opalich claims he could not have breached the restrictive covenants because the covenants ended on November 30, 2020, the day EHO paid him the negotiated lump sum in the Severance Agreement. Doc. 106, Defs.' Br. Supp., 6. Further, he claims there is no evidence demonstrating any breach of the Opalich Agreement. *Id.* In contrast, EHO argues that the Opalich Agreement's "clear intent" was for the covenants to endure for the "period of time equal to the time Opalich would be entitled to receive severance payments." Doc. 113, Pl.'s Resp. Br., 27. Essentially, the covenants were to run until February 1, 2021, regardless of the date of the payment of the severance. *Id.* EHO also argues the evidence supports a finding of breach even before November

30, 2020, which tolled any expiration of the covenants under the Opalich Agreement. *Id.* at 29. The Court agrees with EHO that the evidence demonstrates, at minimum, a genuine dispute of material fact as to whether Opalich breached the Opalich Agreement.

At the outset, the Court cannot find, as a matter of law, that the Severance Agreement triggered the early expiration of Opalich's post-termination restrictive covenants as Defendants claim in their Motion. "[T]he interpretation of an unambiguous contract is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) (internal quotations omitted). However, "when there is a choice of reasonable interpretations of the contract," a material fact issue exists and precludes summary judgment. *Id.* Contractual terms are not ambiguous because of a "simple lack of clarity" or because "parties to an agreement proffer different interpretations of a term." *Sharp Mexican Partners, LP v. Republic Waste Servs. of Tex., Ltd.,* 2019 WL 5887343, at *13 (N.D. Tex. July 23, 2019) (Horan, Mag. J.), *report and recommendation adopted,* 2019 WL 3819208 (N.D. Tex. Aug. 14, 2019) (Scholer, J.). Instead, "ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning." *Id.* "If a contract is not ambiguous, then the Court applies its plain meaning and enforces it as written." *See id.* (internal quotations and alterations omitted).

Here, Defendants have not unambiguously shown that the Severance Agreement terminated his restrictive covenants. Defendants argue "[Opalich] proposed and EHO agreed to a lump sum severance of $71,108.26 in exchange for removing all post-employment competition covenants other than confidentiality." Doc. 106, Defs.' Br. Supp., 31. However, Defendants have not cited, and the Court has not found, any language in the Severance Agreement regarding the removal of the restrictive covenants. Further, the Severance Agreement provides:

> [Opalich] has agreed to this Agreement because of the specific benefits [Opalich] is receiving, which are all listed in this Agreement. [Opalich] promises, warrants, and represents that [Opalich] has not been promised any additional benefits by the [EHO.] . . . [Opalich] has not signed this Agreement because of any written or oral representations by [EHO] or its attorneys or any other person regarding any benefits not listed in this Agreement.

Doc. 114, Pl.'s App., 127. "[C]ourts will not rewrite agreements to insert provisions parties could have included or to imply [benefits] for which they have not bargained." *Tenneco Inc. v. Enter. Products Co.*, 925 S.W.2d 640, 646 (Tex. 1996). The early expiration of the restrictive covenants does not appear in the Severance Agreement, and thus the Court cannot conclude as a matter of law that the Severance Agreement removed the restrictive covenants in the Opalich Agreement.

The evidence also supports, at minimum, a dispute of material fact regarding Opalich's breach of the Opalich Agreement. First, the Court finds that Opalich's communications with Radcliff could support a finding of breach of his non-solicitation obligation. Section 9(b)(v) of the Opalich Agreement provides that Opalich "will not . . . induce, call on, make an offer to, hire, attempt to hire, provide information about or attempt to do any of the same with respect to any employee of [EHO] or any of its affiliates." Doc. 114, Pl.'s App., 77–78. EHO has provided text messages between Radcliff and Opalich in October 2020 discussing Radcliff leaving EHO. *See id.* at 658–59. Opalich states, "I also have a good idea for you to leave EHO and land immediately on your feet." *Id.* at 658. He goes on to say, "Its [sic] a big idea but it is for you not me and keeps in [sic] a prominent hospice industry role." *Id.* Radcliff replies two days later and says, "It's encouraging and hopeful to work with you again!" *Id.* at 659. While Defendants argue Radcliff "contacted [Opalich] to discuss her future employment options," Doc. 106, Defs.' Br. Supp., 32; Doc. 107, Defs.' App., 423, the Court finds that a jury could reasonably conclude these communications constituted solicitation in violation of the Opalich Agreement.

Second, the Court finds a reasonable juror could conclude Opalich breached his confidentiality obligations in the Opalich Agreement by sharing documents such as the Hospice Business Plan and the Reprice Spreadsheet. Section 9(a) of the Opalich Agreement prevents Opalich from disclosing "any Confidential Information to any Person," [2] using "any Confidential Information in soliciting the patronage of any Person for the purpose of providing products or services of the same or similar kind provided in [EHO's] business," or "otherwise us[ing] any Confidential Information for his own purposes." Doc. 114, Pl.'s App., 77. The definition for Confidential Information includes "all trade secrets, proprietary, and other information that is disclosed to or acquired by [Opalich] during or in the course of employment that relates to the business of [EHO]" and "customers' identities and requirements, customer lists, suppliers' identities and products, pricing information, product price discount information, manufacturing processes and procedures, new product research, and financial information and other non-public information[.]" *Id.* at 76. The definition also includes a carve out which states "Confidential Information shall not include: [1] any information that shall become generally known to the industry through no fault of [Opalich]; or [2] any information that [Opalich] can demonstrate was within his legitimate and unrestricted possession prior to the time of his employment by [EHO]." *Id.*

Defendants do not contest that Opalich disclosed information such as the Hospice Business Plan and the Reprice Spreadsheet. Instead, Defendants argue the Hospice Business Plan falls under the Confidential Information carve out and the Reprice Spreadsheet includes "freely shared"

---

[2] Person is defined as "any individual, corporation, limited liability company, partnership, unincorporated organization, joint venture, association, bank, trust, governmental authority, or other entity." Doc. 114, Pl.'s App., 76.

information that is out of date and of no use to Opalich. *See* Doc. 106, Defs.' Br. Supp., 36; Doc. 107, Defs.' App., 8. The Court finds neither argument convincing. First, the Hospice Business Plan was created by Opalich, Radcliff, and Kepler to identify "short-term and long-term hospice business opportunities Radcliff would pursue *if she was hired by EHO*." Doc. 113, Pl.'s Resp. Br., 5 (emphasis added); Doc. 114, Pl.'s App., 21–22. Further, it includes a "hospice strategy" and budgetary considerations specific to EHO. Doc. 114, Pl.'s App., 22. Due to the personalized nature of this document, a dispute of material fact exists as to whether Opalich had this information "within his legitimate and unrestricted possession prior to the time of his employment by [EHO]." *See* Doc. 114, Pl.'s App., 76. And even if Opalich is correct that the information in the Reprice Spreadsheet is out of date, Defendants admit that the Reprice Spreadsheet contains "an estimation of what EHO would charge Capital City/Queen City." Doc. 118, Defs.' Reply, 18. Such information could constitute "pricing information" under the definition of Confidential Information in the Opalich Agreement. *See* Doc. 114, Pl.'s App., 76. Thus, the Court cannot conclude as a matter of law that Opalich did not breach the Opalich Agreement by disclosing the Hospice Business Plan and the Reprice Spreadsheet.

### 2.    Claim Against Radcliff

The Court now turns to the breach of contract claim against Radcliff. EHO alleges "Radcliff breached the Radcliff Agreement by . . . performing consulting services for and receiving undisclosed outside compensation from KemPharm . . ., participating in a company that is in competition with EHO, and using EHO's confidential information to operate HospisRx and solicit EHO's clients and potential clients." Doc. 42, Second Am. Compl., ¶ 83. Defendants argue Radcliff did not breach the Radcliff Agreement because EHO was aware of her KemPharm consulting arrangement, she was not subject to competition restrictions, and she did not disclose EHO's

confidential information for the benefit of HospisRx. Doc. 106, Defs.' Br. Supp., 37–38. In response, EHO identifies four provisions of the Radcliff Agreement and Radcliff's actions it claims breached those provisions. *See* Doc. 113, Pl.'s Resp. Br., 33–37. After review, the Court finds EHO has presented a genuine dispute of material fact as to whether Radcliff breached the Radcliff Agreement.

First, the parties dispute whether EHO knew Radcliff was consulting for KemPharm and this dispute precludes summary judgment. Section 2.1 of the Radcliff Agreement required Radcliff to "devote [her] full business energies, interest, abilities and productive time to the proper and efficient performance of [her] duties under this Agreement." Doc. 114, Pl.'s App., 195. And while Radcliff does not contest that she provided consulting services to KemPharm while employed by EHO, Radcliff declared the board of EHO was aware of her consulting relationship and "no objections [were] expressed." Doc. 107, Defs.' App., 137. However, EHO has presented deposition testimony from an EHO board member stating the opposite. *See* Doc. 114, Pl.'s App., 319 (stating no one knew Radcliff was still consulting for KemPharm while working for EHO). This evidence creates, at minimum, a dispute of material fact regarding whether Radcliff breached Section 2.1 of the Radcliff Agreement.

Next, Radcliff's actions to assist Opalich in forming HospisRx could constitute a breach of the Radcliff Agreement. Section 2.3 of the Radcliff Agreement prevents Radcliff from using "confidential information to solicit or attempt to solicit the business of any client or customer of [EHO] or its Affiliates with respect to products, services, or investments similar to those provided or supplied by [EHO] or its Affiliates." *Id.* at 196. Radcliff's participation in the meetings with Ascend, a customer of EHO, regarding its potential involvement in HospisRx, where the Hospice Business Plan with EHO's information was shared, could constitute a breach of Section 2.3.

Similarly, Section 2.5 prevents Radcliff from "circumvent[ing], avoid[ing], bypass[ing] or obviat[ing] [EHO] directly or indirectly, or interfer[ing] with or usurp[ing] any earning opportunity related to and/or following being introduced to a client, product, property, concept, strategy, opportunity, business relationship, project and/or source of capital by [EHO]." *Id.* at 196. A reasonable juror could conclude Radcliff's decision to take the information regarding the Ohio Health opportunity to Opalich, which she received from an EHO consultant for the benefit of EHO, could constitute disloyalty and improper circumvention under Sections 2.1 and 2.5 under the Radcliff Agreement.

Finally, Radcliff was subject to similar confidentiality obligations as Opalich. Radcliff could not "[d]ivulge any Confidential Information to any person, firm or company or use or exploit it in any way whatsoever." *Id.* at 202. The evidence suggests Radcliff sent the Ohio Health Proposal to Opalich after his termination. *Id.* at 668. It also suggests Radcliff used the Hospice Business Plan and the Reprice Spreadsheet while pursuing opportunities with Opalich and HospisRx. *Id.* at 153, 731–32. Given Radcliff's actions and the Court's prior discussion of Confidential Information, the Court finds a reasonable juror could conclude Radcliff breached her obligations in the Radcliff Agreement.

### 3.    Damages

Finally, the Court addresses EHO's damages. Defendants argue EHO's breach of contract claim must be dismissed because "EHO has not identified any clients it has lost due to Opalich's or Radcliff's actions or inactions." Doc. 106, Defs.' Br. Supp., 30. EHO responds with five potential forms of relief: (1) costs EHO incurred to develop the confidential information disclosed; (2) the cost of forensic examinations of Defendants' computers; (3) the salary Radcliff received during her contractual breaches; (4) nominal damages; and (5) an injunction to prevent Defendants from

continuing to breach the Agreements. Doc. 113, Pl.'s Resp. Br., 38–40. Here, the Court finds EHO has identified at least two viable theories of damages, making summary judgment inappropriate.

"A party may not recover damages for breach of contract if those damages are remote, contingent, speculative, or conjectural." *City of Dallas v. Villages of Forest Hills, L.P., Phase I,* 931 S.W.2d 601, 605 (Tex. App.—Dallas 1996, no writ).

> The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage *actually sustained*. . . . A nonbreaching party is generally entitled to all actual damages necessary to put it in the same economic position in which it would have been had the contract not been breached.

*Abraxas Petrol. Corp. v. Hornburg,* 20 S.W.3d 741, 760 (Tex. App.—El Paso 2000, no pet.) (internal citations omitted and emphasis added). However, while "uncertainty as to the fact of legal damages is fatal to recovery, . . . uncertainty as to the amount will not defeat recovery. A party who breaks his contract cannot escape liability because it is impossible to state or prove a perfect measure of damages." *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1099 (1938).

Here, EHO has provided sufficient evidence to create a genuine dispute of material fact as to whether it is entitled to damages for Defendants' breaches of the Opalich and Radcliff Agreements. First, EHO could recover damages for the costs of the forensic examinations of Defendants' computers. *See Sandberg v. STMicroelectronics, Inc.,* 600 S.W.3d 511, 528 (Tex. App.—Dallas 2020, pet. denied) (finding forensic examinations could constitute direct damages for a breach of contract claim); Doc. 114, Pl.'s App., 1172–73 (stating EHO paid $4,588.92 for forensic examinations of Defendants' computers). Second, EHO could recover the salary and benefits it paid to Radcliff while she was in breach of the Radcliff Agreement. *McGowan & Co. v. Bogan*, 2015 WL 3422366, at *10 (S.D. Tex. May 27, 2015) (distinguishing a salary and benefits damage theory from a lost profits damage theory and denying defendant's summary judgment

motion); Doc. 114, Pl.'s App., 196 (stating Radcliff would receive a salary of $160,000 annually). Because the Court finds EHO has provided evidence of reasonably certain damages,[3] the Court **DENIES** Defendants' Motion for Summary Judgment as to EHO's breach of contract claim.

B.    *Breach of Fiduciary Duty*

Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Therefore, here, the Court will apply Texas substantive law to the breach of fiduciary duty claim. Under Texas law, "[t]he elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Jones v. Blume,* 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied). A fiduciary duty generally entails "fair dealing and good faith" and "integrity and fidelity." *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 199 (Tex. 2002). When a fiduciary relationship exists between an employer and an employee, an employee "has a duty to act primarily for the benefit of the employer in matters connected with his [employment]." *Abetter Trucking Co. v. Arizpe,* 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

But, "an employer's right to demand and receive loyalty must be tempered by society's legitimate interest in encouraging competition." *Johnson,* 73 S.W.3d at 201. Under Texas law, "[a]n at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed." *Id.* (citing *Augat, Inc. v. Aegis, Inc.,* 565 N.E.2d 415 (Mass. 1991)). And a fiduciary relationship "does not preclude the fiduciary from making

---

[3] Because EHO has identified several viable damage theories, the Court declines to address all five theories listed in EHO's Response. *See* Doc. 113, Pl.'s Resp. Br., 38–40.

preparations for a future competing business venture; nor do such preparations necessarily constitute a breach of fiduciary duties." *Abetter Trucking,* 113 S.W.3d at 510.

However, the Texas Supreme Court has imposed limitations on an employee's right to prepare to compete with his employer.

> [An employee] may not appropriate his employer's trade secrets . . . . He may not solicit his employer's customers while still working for his employer . . ., and he may not carry away certain information, such as lists of customers. . . . Of course, such a person may not act for his future interests at the expense of his employer by using the employer's funds or employees for personal gain or by a course of conduct designed to hurt the employer.

*Johnson,* 73 S.W.3d at 202 (omissions in original) (citing *Augat,* 565 N.E.2d at 419–20).

And while "[f]iduciary duties generally terminate at the end of an employment relationship," *Hunn v. Dan Wilson Homes, Inc.,* 789 F.3d 573, 581 (5th Cir. 2015), some duties survive the termination of employment, *Miller Paper Co. v. Roberts Paper Co.,* 901 S.W.2d 593, 600 (Tex. App.—Amarillo 1995, no writ). One such duty "forbids an employee from using confidential or proprietary information acquired during the relationship in a manner adverse to his employer." *Id.* "Although this duty does not bar use of general knowledge, skill, and experience, it prevents the former employee's use of confidential information or trade secrets acquired during the course of employment." *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.,* 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd).

Both Defendants admit they owed fiduciary duties to EHO by virtue of their roles as EHO executives. *See* Doc. 43, Radcliff Answer, ¶ 86; Doc. 46, Opalich Answer, ¶ 71. However, Defendants argue EHO cannot point to any evidence of a breach of those duties or damages as a result of a breach. Doc. 106, Defs.' Br. Supp., 30. The Court considers the alleged breaches against each defendant and then turns to damages.

1.    Claim Against Opalich

The Court first addresses the breach of fiduciary duty claim against Opalich. EHO claims Opalich breached his fiduciary duties by "retain[ing] EHO's confidential information after his termination" and "repeatedly and irrefutably misus[ing] EHO's confidential information for his own and HospisRx's benefit." Doc. 113, Pl.'s Resp. Br., 41–42. And while Defendants argue EHO has presented no evidence of a breach of Opalich's fiduciary duties, Doc. 106, Defs.' Br. Supp., 40, the Court disagrees.

Evidence of Opalich's actions following his termination from EHO creates at least a dispute of material fact regarding his breach of his confidentiality obligations. While Opalich's fiduciary duties to EHO did not restrict his ability to compete with EHO after his termination,[4] Opalich was not permitted to use EHO's confidential information to do so. *See Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ) ("[A] former employee is precluded from using . . . confidential information . . . acquired by or imparted to him in the course of his employment.") (internal quotations omitted).

As discussed above, a reasonable juror could conclude the Hospice Business Plan and the Reprice Spreadsheet constituted EHO's confidential information. *See supra* Section III.A.1. And Opalich admits he shared these documents with individuals outside of EHO for his and HospisRx's benefit in a manner adverse to EHO. *See* Doc. 106, Defs.' Br. Supp., 23, 36; Doc. 107, Defs.' App., 241, 245, 874. Given Opalich's duty of confidentiality extended beyond his employment, *see T-N-T Motorsports, Inc.*, 965 S.W.2d at 22, Opalich's use of these documents to either obtain

---

[4] Whether Opalich was subject to other competition restrictions, such as the provisions identified by EHO in the Opalich Agreement, is a separate question and addressed in the previous section. *See supra* Section III.A.1.

employment or further his new Pharmacy Benefits Management company could constitute a breach of his fiduciary duties. *See Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 858 (Tex. App.—Fort Worth 2004, no pet.) ("[A] former employee may not use confidential information or trade secrets the employee learned in the course of his employment for his own advantage and to the detriment of his employer.").

### 2.    Claim Against Radcliff

The Court next addresses the breach of fiduciary duty claim against Radcliff. EHO claims Radcliff breached her fiduciary duties to EHO during and after her employment by disclosing confidential information to individuals outside EHO, using confidential information to compete with EHO, usurping EHO business opportunities, and performing consulting services for KemPharm during her employment. Doc. 113, Pl.'s Resp. Br., 42. Defendants argue Radcliff's actions did not constitute a breach of any duty. Doc. 106, Defs.' Br. Supp., 40–41. Again, the Court disagrees.

A reasonable juror could find Radcliff's conduct during her employment violated her duties to EHO. The evidence suggests Radcliff performed consulting services for KemPharm while employed by EHO, a fact an EHO employee declared she never disclosed. *See* Doc. 106, Defs.' Br. Supp., 4–5; Doc. 114, Pl.'s App., 317–18, 347–48. It also suggests she sent Opalich the Ohio Health Proposal, potentially confidential information, after his employment was terminated. *See* Doc. 114, Pl.'s App., 668. A reasonable juror could conclude these actions violated Radcliff's duty of loyalty to EHO and her duty to not "use [EHO's] confidential or proprietary information . . . in a manner adverse to [EHO]." *See Anadarko Petrol. Corp. v. Davis*, 2006 WL 3837518, at *16 (S.D. Tex. Dec. 28, 2006). Most notably, EHO produced evidence indicating Radcliff received information regarding a business opportunity with Ohio Health intended for EHO and instead passed the

information to Opalich.  Doc. 114, Pl.'s App., 387–88. Evidence of Radcliff's decision to "divert[] an opportunity from [EHO]" creates at minimum a dispute of material fact as to whether she breached her fiduciary duties. *See Johnson,* 73 S.W.3d at 200.

     <u>3.</u>   <u>Damages</u>

     Finally, the Court addresses EHO's damages for breach of fiduciary duty. Defendants again argue that EHO has not identified any lost clients or any monetary damages because of Defendants' actions. Doc. 106, Defs.' Br. Supp., 30. However, to prevail on summary judgment, Defendants must demonstrate that there is no dispute of material fact that Defendants' action did not result in "injury to [EHO] or benefit to [Opalich or Radcliff]." *See Jones,* 196 S.W.3d at 447. Defendants have only facially argued that EHO was not injured by their conduct. *See* Doc. 106, Defs.' Br. Supp., 30. In contrast, EHO has put forth evidence that Defendants have received benefits "by virtue of their breaches of fiduciary duty that are subject to forfeiture or disgorgement." Doc. 113, Pl.'s Resp. Br., 44. Thus, a dispute of material fact remains as to whether Defendants benefitted from their alleged misconduct, and summary judgment is improper. The Court **DENIES** Defendants' Motion for Summary Judgment as to EHO's breach of fiduciary duty claims.

C.    *Fraudulent Inducement*

     Finally, Defendants seek summary judgment on EHO's final claim, fraudulent inducement against Opalich regarding his actions leading up to the execution of the Severance Agreement. *See* Doc. 106, Defs.' Br. Supp., 41–43. EHO alleges Opalich induced EHO to sign the Severance Agreement by falsely claiming:

> (a) he did not misuse EHO's confidential information during his employment; (b) he returned all of EHO's confidential information in his possession; (c) he destroyed and permanently deleted all of EHO's confidential information from any personal devices and email accounts; and (d) he did not share or disclose any of EHO's confidential information to any third parties.

Doc. 42, Am. Compl., ¶ 75. Defendants argue this claim fails because EHO has not identified a material misrepresentation it relied on or any damages it suffered. Doc. 106, Defs.' Br. Supp., 30, 42–43. The Court is unconvinced.

For the same reasons discussed in Section III.B, *supra*, the Court will apply Texas substantive law to the fraudulent inducement claim. Fraudulent inducement involves fraud in the formation of a contract. *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 277 (5th Cir. 2012) (internal quotations and citation omitted). Thus, "the elements of fraud must be established as they relate to an agreement between the parties." *Id.* To state a claim for fraudulent inducement, a plaintiff must establish the elements of fraud:

> (1) a material misrepresentation; (2) that is false; (3) when the defendant made the representation, the defendant knew it was false or made the statement without any knowledge of its truth; (4) the defendant intended the plaintiff to rely on the representation, and the plaintiff actually relied on the representation; and (5) the defendant's actions caused an injury.

*Kevin M. Ehringer Enters., Inc. v. McData Servs. Corp.*, 646 F.3d 321, 325 (5th Cir. 2011). "A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving and with no intention of performing the act." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). Here, the alleged false promises are the contractual obligations themselves.

Regarding Opalich's misrepresentation argument, the Court finds there is evidence to support a material misrepresentation. In the Severance Agreement and corresponding affidavit, Opalich agreed that:

> (a) he would not use EHO's confidential information after the termination of his employment; (b) he had returned all of EHO's confidential information and would not retain copies or derivations of any Company records, documents, materials or information (including Confidential Information) (whether in hardcopy, on

electronic media or otherwise); and (c) he permanently deleted and removed all
electronic copies of any information (including Confidential information) that he
had obtained during his employment from all his personal devices and destroyed all
copies so that he could not access any of this information again in the future.

Doc. 113, Pl.'s Resp. Br., 12 (internal quotations omitted) (quoting Doc. 114, Pl.'s App., 131–133).

However, the evidence suggests that prior to signing the Severance Agreement, Opalich obtained

and began using the Hospice Business Plan to further his own interests. *See* Doc. 114, Pl.'s App.,

136–38.  And after the Severance Agreement was signed, he continued to use and distribute the

Hospice Business Plan, the Ohio Health Proposal, and the Reprice Spreadsheet. *See supra* Section

II.C. Given Opalich's role in the creation and use of these documents as CEO of EHO, a reasonable

juror could conclude Opalich knew these documents were confidential and signed the Severance

Agreement with no intention of "not us[ing,]" "return[ing,]" and "permanently delet[ing,]" the

confidential information to induce EHO to pay him over $70,000. *See Spoljaric*, 708 S.W.2d at 434.

As to Opalich's damages argument, the Court finds EHO has sufficiently articulated its

damages. The Texas Supreme Court has held that "tort damages are recoverable for a fraudulent

inducement claim irrespective of whether the fraudulent representations are later subsumed in a

contract or whether the plaintiff only suffers an economic loss related to the subject matter of the

contract." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47

(Tex. 1998). Thus, "if a plaintiff presents legally sufficient evidence on each of the elements of a

fraudulent inducement claim, any damages suffered as a result of the fraud sound in tort." *Id.* Here,

EHO paid Opalich $71,108.26 in exchange for Opalich fulfilling his obligations in the Severance

Agreement. *See* Doc. 114, Pl.'s App., 121. Thus, if a jury concludes Opalich fraudulently induced

EHO to enter the Severance Agreement, EHO would be entitled to the money it was induced to

pay Opalich. For these reasons, the Court **DENIES** Defendants' Motion for Summary Judgment as to EHO's fraudulent inducement claim.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion for Summary Judgment (Doc. 105).

**SO ORDERED.**

**SIGNED: March 17, 2023.**

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE